# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1840V
Filed: August 3, 2023

| | |
|---|---|
| GABRIEL RASTETTER,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Special Master Daniel Horner |

*John Robert Howie, Jr.*, Howie Law, P.C., Dallas, TX, for petitioner.
*Catherine Stolar*, U.S. Department of Justice, Washington, DC, for respondent.

## **DECISION AWARDING DAMAGES**[1]

On December 4, 2019, Misty and Matthew Rastetter filed a petition on behalf of their son, Gabriel ("petitioner")[2], for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[3] (the "Vaccine Act"). They alleged that Gabriel's influenza ("flu") vaccination on November 2, 2017, caused him to develop Guillain-Barre syndrome ("GBS"). (ECF No. 1, p. 1.) On July 25, 2022, a ruling on entitlement was issued finding petitioner is entitled to compensation for his GBS. (ECF No. 53.) For the reasons discussed below, I now find that petitioner should be awarded damages in the amount of $195,059.44.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] On January 26, 2023, Gabriel was substituted as petitioner after he had reached the age of majority. (ECF No. 61.)

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa.

1

## I.     Procedural History

As noted above, this case was initially filed on December 4, 2019. (ECF No. 1.) Petitioner's medical records were filed as Exhibits 1-14. (ECF Nos. 5-8, 10, 13, 16.) Respondent filed a Rule 4 Report recommending against compensation on April 24, 2020, raising a factor unrelated to vaccination as the cause of petitioner's GBS. (ECF No. 18.)  However, after further litigation including an exchange of expert reports (*see* Exs. A-B, 15-64), respondent filed an amended Rule 4 Report concluding that there is not preponderant evidence to support a more likely alternative cause for petitioner's GBS and a ruling on entitlement was issued based on respondent's change of position. (ECF Nos. 51, 53.)

The parties attempted to resolve damages informally, but advised as of October 26, 2022, that they had reached an impasse. (ECF No. 58.)  In the course of damages discussions, petitioner filed additional evidence marked as Exhibits 65-85, mostly consisting of photographs, videos, and sworn statements.  Petitioner filed a motion for a ruling on the record regarding damages on February 3, 2023. (ECF No. 64.) Respondent filed his response on April 7, 2023, and petitioner filed a reply on April 21, 2023. (ECF Nos. 68-69.)

Accordingly, this case is now ripe for resolution with respect to the appropriate amount of compensation for petitioner's damages.

## II.    Factual History

### a.  As reflected in medical records[4]

Petitioner received a flu vaccine on November 2, 2017. (Ex. 7, p. 2.)  At the time, he was in excellent health and his medical history was unremarkable. (Ex. 5, pp. 37-40.)  On November 12, 2017, petitioner experienced tingling in his fingers and toes. (Ex. 1, p. 6.)  The following day, petitioner became extremely tired. (*Id.*)

On November 14, 2017, petitioner's feet went numb, and he became unable to walk without assistance. (*Id.* at 2.)  Petitioner presented to the emergency room with numbness in his extremities, poor appetite, headaches, gait disturbance, dysarthria, and weakness. (Ex. 5, pp. 48-49.)  Petitioner had elevated blood pressure, labored breathing, decreased strength bilaterally in the lower and upper extremities, abnormal coordination and gait, and reduced Achilles tendon reflexes bilaterally. (*Id.* at 50-51.) Petitioner also reported a sensation of incomplete voiding with urination. (Ex. 7, p.14.)

---

[4] Petitioner attached two exhibits to his motion that include extensive reference to specific comments from petitioner's medical records.  "Damages Brief Exhibit 1" includes "substantive comments from petitioner's first round of out-patient therapy spanning from January 15, 2018 to March 26, 2018." (ECF No. 64-1.) "Damages Brief Exhibit 2" includes "substantive comments from petitioner's second round of out-patient therapy spanning from August 8, 2019 through October 16, 2019." (ECF No. 64-2.)  This factual summary does not attempt to capture all of the record notations included in these two exhibits; however, I have reviewed and considered all of the notations listed within these exhibits.

2

The physician suggested petitioner had GBS.  (Ex. 5, p. 51.)  Petitioner was transferred by ambulance to Blank Children's Hospital.  (Ex. 1, p. 2.)  A physical exam at Blank Children's Hospital revealed petitioner could sit upright with effort and walk 3 to 4 feet with assistance.  (Ex. 7, p. 5.)

On November 15, 2017, petitioner struggled to speak and swallow.  (Ex. 7, pp 102.)  He also reported tingling in his tongue and cheeks and increasing numbness in his lower extremities.  (*Id.*)  Petitioner was evaluated by a pediatric neurologist at Blank Children's Hospital who assessed petitioner, noting "acute onset and ascending paralysis" that was "[c]oncerning for acute Guillain-Barré syndrome."  (*Id.* at 25-26.)  The neurologist also noted petitioner was too weak to speak for long periods of time.  (*Id.* at 25.)  Petitioner's MRIs and lumbar puncture were consistent with GBS.  (*Id.* at 86-89, 140-141.)  As of the evening of November 15, petitioner had developed a weak cough.  (*Id.* at 110.)  He was unable to swallow water from ice chips or his own secretions from coughing.  (*Id.*)  Petitioner's tongue had gone completely numb and he was only able to whisper.  (*Id.*)

On November 16, 2017, petitioner was intubated as he progressed to respiratory failure.  (*Id.* at 29, 33.)  Additionally, petitioner underwent placement of a nasogastric tube and a Foley catheter.  (*Id.* at 33, 80, 127.)  Petitioner also developed a red rash.  (*Id.* at 111.)  During examination, petitioner's ankle and knee reflexes were unsolicited.  (*Id.* at 90.)  Petitioner's condition remained relatively stable from November 16 to November 17, during which petitioner had no leg movement or grip strength but would open his eyes intermittently.  (*Id.* at 69, 71, 74.)

During a physical exam on November 18, 2017, petitioner was responsive to commands and able to communicate by mouthing words and nodding his head.  (*Id.* at 65.)  Petitioner was able to move his forearms minimally and some of his facial muscles.  (*Id.* at 64.)  On November 20, petitioner was started on labetalol because of hypertension due to dysautonomia secondary to GBS.  (*Id.* at 11.)  A neurological examination the next day revealed petitioner's condition was worsening.  (*Id.* at 48-49.)  He was no longer able to communicate by shrugging a shoulder or squeezing a hand.  (*Id.*)  Petitioner had weakness in all four extremities, no deep tendon reflexes, and no anti-gravity movements.  (*Id.* at 48.)

On November 22, 2017, petitioner was transferred from Blank Children's Hospital to the University of Iowa Stead Family Children's Hospital for more specialized neurological care.  (*Id.* at 37, 49)  At this time, petitioner's urine output had decreased, and he indicated that his stomach hurt.  (*Id.* at 37.)  Upon arrival, petitioner was "[i]ntubated, minimally sedated, mechanically ventilated, not in respiratory distress, [could] shake and nod [his] head," and moved his tongue to respond to questions.  (Ex 8, p. 8.)  He demonstrated flaccid paralysis of all extremities, intact sensation, and absent deep tendon reflexes.  (*Id.*)  Petitioner was assessed with acute respiratory failure requiring mechanical ventilation secondary to significant neuromuscular weakness, acute ascending paralysis, and hypertension.  (*Id.*)  He met with Dr. Lee-Son

3

the same day for a nephrology consultation.  (*Id.* at 15-16.)  At this consultation, his parents noted petitioner was "not a particularly active child" and played "video games and computers mostly."  (*Id.* at 16.)

On November 24, 2017, petitioner experienced some motor improvement.  (*Id.* at 40.)  He was able to sense touch in all four extremities.  (*Id.* at 47.)  Additionally, petitioner developed painful oral lesions due to his braces constantly rubbing on the inside of his lips.  (*Id.* at 181.)  The next day, petitioner was treated with antibiotics after a urinalysis revealed a staphylococcus infection.  (*Id.* at 87.)   As of November 26, petitioner required Ativan and an increase in his midazolam drip.  (*Id.* at 69.)  He experienced an increase in his hypertension during this time.  (*Id.*)

On November 27, 2017, petitioner met with occupational therapy.  Petitioner was able to answer yes or no questions, however he was anxious and frustrated when trying to communicate.  (*Id.* at 75.)  Petitioner indicated he was experiencing shoulder and hip pain.  (*Id.* at 75, 77.)  Functional position splints were placed on his bilateral upper extremities.  (*Id.* at 75-76.)  He was unable to activate his lower extremity muscles.  (*Id.* at 78.)

Petitioner began a five-day course of intravenous immune globin ("IVIG") on November 29, 2017.  (*Id.* at 150.)  His condition began to improve after starting this treatment.  (*Id.* at 191.)  By December 1, 2017, petitioner was able to move his thighs.  (*Id.*)  A neurological exam demonstrated petitioner had 2/5 bicep strength, 2/5 right thigh strength, and 2/5 hip strength.  (*Id.* at 195.)  On December 2, petitioner was successfully extubated and placed on bilevel positive airway pressure ("BiPAP").  (*Id.* at 198.)  On December 4, Dr. Matsumoto, a pediatric neurologist, noted that petitioner was showing slight improvement every day.  (*Id.* at 239.)  Petitioner was able to shrug his shoulders and minimally extend his fingers.  (*Id.* at 271.)  The results of an EMG/NCS taken the same day revealed a severe sensorimotor demyelinating polyneuropathy with axonal loss and signs of denervation.  (*Id.* at 276, 283-86.)

On December 8, 2017, petitioner was transferred to ChildServe rehabilitation, at which time he could lift both forearms, wiggle his toes on his right foot, move his trunk and head, and eat and drink.  (*Id.* at 278, 280.)  Petitioner's speech was also improved.  (*Id.* at 277.)  Upon arriving at the rehabilitation center, petitioner felt that he could hold his urine.  (Ex. 9, p. 3.)  He was eating food by mouth; however, he still required NG overnight feeds because his caloric intake was too low.  (*Id.*)  It was noted that petitioner would require extensive rehabilitation due to his weak upper extremities and flaccid lower extremities.  (*Id.* at 3-4.)  Although petitioner was able to move his arms, his abilities were limited and feeding himself was challenging.  (*See* Exs. 75, 76.)  On December 11, petitioner's nasogastric tube was removed.  (Ex. 9, p. 64.)  Petitioner continued to experience dysarthria.  (*Id.* at 31.)  As of December 14, petitioner required a sequential compression device ("SCD") while in bed.  (*Id.*)

4

During his time at ChildServe, petitioner experienced significant improvement in his lower and upper extremity weakness with aggressive rehabilitation therapy. (*Id.* at 67.)  He progressed to walking without assistance, though he continued to experience hypertension. (*Id.*)  On January 12, 2018, petitioner was discharged from ChildServe rehabilitation and sent home. (*Id.* at 20-24, 67.)  He was walking with assistance and had no bowel or bladder incontinence as of his discharge date. (*Id.* at 67.)  However, he continued to have hypertension. (*Id.*)  He demonstrated normal upper extremity strength and 3+ strength in his lower extremities. (*Id.*)

Petitioner was scheduled to return to school for half-days, beginning on January 22, 2018, with the goal of increasing time at school as he improved. (*Id.* at 22, 64.)  On February 1, 2018, petitioner informed his physical therapist that he was not feeling pain or fatigue. (Ex. 5, p. 177.)  Petitioner was attending full days at school and no longer using his four-wheeled walker. (*Id.*)  On February 14, petitioner followed up with Dr. Lee-Son regarding his hypertension. (Ex. 8, p. 2783.)  At this time, petitioner was back in school full-time, could walk "well," and was able to "go up and down the stairs without issues." (*Id.*)

On February 21, 2018, petitioner saw neurologist Katherine Mathews, M.D., for a follow-up appointment. (*Id.* at 2796-99.)  He informed Dr. Mathews that, although he had started participating in P.E. and was displaying "significant continued improvement," he felt that his right arm was weak and he was incapable of running. (*Id.* at 2796.)  Petitioner also mentioned increased sensitivity on the soles of his feet and mild low thoracic back pain with prolonged standing. (*Id.*)  He denied numbness. (*Id.*)  Upon examination by Dr. Mathews, petitioner exhibited decreased strength in his triceps, dorsiflexion, and plantarflexion. (*Id.* at 2798.)  He was able to run briefly and "toe walk," but he could not "heel walk." (*Id.*)  Petitioner's reflexes were absent bilaterally, with the exception of 1+ in the right quadriceps. (*Id.*)  Petitioner had normal proprioception and sensitivity to temperature and vibration in his upper extremities. (*Id.*)  Dr. Mathews noted petitioner was "markedly improved from his examination on discharge [from ChildServe]," but instructed petitioner to continue physical and occupational therapy as his "recovery could continue to around one year." (*Id.*)

On February 23, 2018, petitioner informed his physical therapist that he was regaining more strength and balance and overall "[d]oing better." (Ex. 11, p. 4.)  Petitioner did not "feel like he fatigue[d] quicker or anything." (*Id.*)  Petitioner also informed his occupational therapist that he had been "feeling good the last few days." (*Id.* at 8.)  Five days later, petitioner told his occupational therapist that school had been going well and that his home exercises were "fine, not that difficult." (*Id.* at 17.)  On March 2, 2018, petitioner informed his physical therapist that he was feeling "good overall" and "not worn out or tired". (*Id.* at 22.)  On March 7, petitioner's mother informed the occupational therapist that petitioner had only been completing his home exercises once a day because it was "hard for them to remember" to perform them twice a day. (*Id.* at 31.)  By March 26, petitioner's physical therapist noted "improved

5

strength and balance," although petitioner complained of "a little right sided issue, usually with fatigue." (*Id.* at 54-55.)  Petitioner still experienced fatigue with increased tasks and "need[ed] to work with strength and stability," but the physical therapist felt that petitioner could do so at home. (*Id.* at 55.)  He was discharged from physical therapy after completing fifteen sessions. (*Id.*)  The same day, petitioner informed his occupational therapist that he had a head cold and was "unsure if he [was] feeling stronger [due to] feeling somewhat weak with his cold." (*Id.* at 58.)  Petitioner was discharged from occupational therapy after completing thirteen sessions. (*Id.*)

On May 15, 2018, petitioner presented for a follow-up visit with Barbara Weber, ARNP. (Ex. 12, p. 28.)  Petitioner's active problem list at the time of this appointment included GBS, hypertension, and autonomic dysfunction. (*Id.* at 29.)  Petitioner had a right sided limp, "somewhat rounded" posture, and absent reflexes. (*Id.* at 29-30.)  At this appointment, ARNP Weber discontinued petitioner's labetalol for hypertension. (*Id.* at 30.)  On August 8, 2018, petitioner had a follow-up appointment with nephrology. (Ex. 10, pp. 12-16.)  His renal function and blood pressure were stable. (*Id.* at 16.)  Petitioner reported playing soccer in the spring of 2018 with no difficulties. (*Id.* at 12.)

On August 2, 2019, almost one year later, petitioner reported to ARNP Weber that his "[s]ymptoms initially improved with [physical therapy] and [occupational therapy]," but he still felt "unable to enjoy and perform certain [activities of daily living] secondary to weakness and pain." (Ex 12, p. 39.)  Petitioner also reported weakness in his right upper and bilateral lower extremities and arthralgias in his cervical and thoracic spine; however, his physical exam was unremarkable. (*Id.* at 40-41.)  ARNP Weber's assessment of petitioner included chronic bilateral thoracic back pain, cervicalgia, weakness of both lower extremities, right arm weakness, and history of GBS. (*Id.* at 41.)  She referred petitioner for continued physical and occupational therapy. (*Id.*)

On August 8, 2019, petitioner met with a new occupational therapist. (Ex. 11, p. 64.)  Petitioner and his mother noted that he was "not worse from previous [occupational and physical therapy] treatment in early 2018." (*Id.*)  Petitioner's mother, however, complained that she had been noticing that petitioner was "generally fatigued" and "uncoordinated with gross motor movements." (*Id.*)  The therapist did not think petitioner required skilled therapy and instead provided petitioner with a home exercise program. (*Id.*)

On August 12, 2019, petitioner met with a new physical therapist who observed that petitioner was "likely still experiencing myelin regeneration and growth as he recover[ed]" as his exam findings were "consistent with the diagnosis of chronic fatigue, poor endurance[,] and pain following Guillain Barre Syndrome." (*Id.* at 66-69.)  Following this re-evaluation, petitioner attended another twelve therapy sessions. (*Id.* at 70-129.)  On August 21, petitioner reported to his physical therapist that he had been "feeling pretty alright." (*Id.* at 72.)  Petitioner met with his physical therapist again on August 27, where he reported "[f]eeling fine," and "having less difficulty with stairs at school," although he still felt "weaker than prior to GBS." (*Id.* at 82.)

On September 12, 2019, petitioner's physical therapist instructed petitioner to "complete strengthening everyday" because he was not completing his home exercises consistently enough. (*Id.* at 98.)  On September 19, petitioner met with his physical therapist again where he noted his struggle with fatiguability. (*Id.* at 106.)  His physical therapist observed this was a "common chronic issue following GBS." (*Id.*)  On October 10, 2019, petitioner complained of fast onset of fatigue with exercise "especially in the [lower extremities]." (*Id.* at 117.)  On October 16, petitioner's physical therapist noted he was "still very fatiguable in his [lower extremities]." (*Id.* at 129.)  The physical therapist noted that petitioner "continue[d] to require skilled therapy" and recommended "neural gliding, strength training, endurance training, postural education and modalities as needed to modulate pain." (*Id.*)  Petitioner, however, did not return for additional therapy sessions.

On March 14, 2022, over two years later, petitioner returned to SMH Physical Therapy to undergo an evaluation. (Ex. 81, p. 8.)  Petitioner's mother informed the therapist that "there [was] a current court case regarding the flu vaccine from 2017" and they "wanted a full body examination for their lawyer." (*Id.* at 9.)  At this visit, petitioner denied any numbness or tingling in his extremities, changes in his strength, and fatigue. (*Id.*)  He complained of low back pain and numbness that was always there, but not extreme. (*Id.*)  Petitioner also reported occasional right shoulder pain with excessive activity in addition to loss of balance since onset of his GBS. (*Id.*)  He described his functional limitations as standing up straight and standing for long periods of time. (*Id.*)

Upon examination, petitioner exhibited a flattened lumbar lordosis, increased thoracic kyphosis, mild thoracic pain with rotation of the thoracic spine, tenderness with hypertonicity in the lumbar paraspinal muscles, and hypomobility at L3-S1. (*Id.* at 9-10.)  Petitioner had reduced right hand grip strength and 4/5 strength in his right shoulder flexion, right external rotation, right interossei, and right adductor hallucis, compared with 5/5 strength on the left. (*Id.* at 10.)  Petitioner also demonstrated 4/5 strength in both hip flexors and each extensor hallucis longus, absent reflexes in the right deltoid, and slight circumduction of the right foot. (*Id.*)  He also demonstrated more sway and unsteadiness in his right lower extremity on the single leg stance test, a positive median nerve test bilaterally, and a positive straight leg raise test bilaterally. (*Id.* at 10-11.)  The physical therapist noted petitioner's exam findings were "consistent with the diagnosis of residual neurodynamic restrictions and pain from [his] history of GBS and neural scarring." (*Id.* at 11.)  Petitioner was provided a home exercise plan for back stretching. Additional skilled therapy was also recommended but declined. (*Id.*)

### b. Additional evidence

In addition to the above-discussed medical records, petitioner and his mother have both provided sworn statements. (Ex. 84 (petitioner's statement); Ex. 83 (Ms. Rastetter's statement).) Petitioner has also filed a number of photographs and videos. (Exs. 65-81.)

Petitioner explains that he had no abnormal health conditions prior to his GBS and that, as a 7th grader, "[l]ife was definitely uncomplicated." (Ex. 84, p. 1.) In that regard, Ms. Rastetter recalls that petitioner had a thirteenth birthday party just two days prior to onset of his GBS, which she describes as "rambunctious." (Ex. 83, p. 1.) Several photographs in evidence show petitioner playing basketball and jumping on trampolines at his November 11, 2017 birthday party. (Exs. 65-68.)

Both petitioner and his mother recall onset of his GBS beginning on his November 13 birthday. (Ex. 84, p. 1; Ex. 83, p. 1.) Petitioner began experiencing fatigue that day and both he and his mother recall a choking incident at K-Mart that occurred that day. (*Id.*) His condition continued to deteriorate, and he was taken to the emergency department the next day. (Ex. 84, p. 2; Ex. 83, p. 2.) In contrast to the photographs from his birthday party, a number of additional photographs show petitioner between onset and nadir of his GBS, including many photographs taken during his initial hospitalization and intubation. (Exs. 69-72.) During this period, petitioner indicates that he was "terrified" because of what he had learned about GBS and that he felt that he "knew [he] was dying." (Ex. 84, p. 3.) He explains that once he was intubated, he was in and out of consciousness, though he does also recall what it was like to be on mechanical ventilation, which felt like suffocating. (*Id.*) Ms. Rastetter provides further description of what petitioner experienced while he was sedated, intubated, and mechanically ventilated. (Ex. 83, p. 3-4.)

Additional video exhibits show petitioner during his remaining hospital stay in December of 2017 after his extubation along with a photograph taken at the time of his discharge to inpatient rehabilitation. (Exs. 73-76.) Both petitioner and his mother provide a description of this period. (Ex. 83, p. 4; Ex. 84, pp. 3-4.) Petitioner focuses in particular on his nerve pain and his embarrassment at having to rely on his nurses to change and clean him due to his bowel and bladder incontinence. (Ex. 84, p. 4.) Further photographs and videos document his inpatient rehabilitation, culminating with a photograph of petitioner walking with the assistance of a walker on January 8, 2018. (Exs. 77-80.) Petitioner characterizes rehabilitation as "an incredibly painful, difficult, and frustrating process." (Ex. 84, p. 4.)

Petitioner explains that his physical condition "markedly improved" and he returned to school as of late January 2018. (*Id.*) However, he remained weak, used a walker, was initially only attending half days, and was required to have a "buddy" walk him to class, all of which he found very embarrassing. (*Id.*) Petitioner suggests that all of this has changed his personality, leaving him less optimistic and more closed off from people. (*Id.* at 4-5.) Petitioner indicates that he still has ongoing sequela. In particular, he explains that he is still "clumsier" with respect to movement and fine motor skills, experiences back pain, and has difficulty throwing. (*Id.* at 5.) A further video shows petitioner walking on June 30, 2019. (Ex. 81.) The exhibit label suggests it is intended to evidence "ongoing walking impairment," though no impairment is readily observable to the undersigned, especially without a point of comparison.

### III.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 300aa-15(a)(4).  Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses and reasonable projected unreimbursable expenses which . . . (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, [and] rehabilitation . . . determined to be reasonably necessary." § 300aa-15(a)(1)(B).  Finally, petitioners who have had their earning capacity adversely impacted due to their vaccine injury may receive "compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections." § 300aa-15(a)(3)(A). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

In this case, only petitioner's award for pain and suffering and emotional distress is at issue.  There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (noting that "[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) (concluding that "the assessment of pain and suffering is inherently a subjective evaluation").  In general, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior awards when determining what constitutes an appropriate award of damages. *See, e.g.*, *Doe*34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (explaining that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, while potentially persuasive, decisions regarding prior awards are not binding. *See Nance v. Sec'y of Health & Human Servs.*, No. 06-730V, 2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010); *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand.").

### IV. Party Contentions

Petitioner requests an award amounting to the statutory cap of $250,000.00 for both actual and projected pain and suffering as well as $59.44 to reimburse a Medicaid lien. (ECF No. 64, pp. 2, 38-39.) Petitioner asserts no claim with respect to out-of-pocket expenses or lost earning capacity. (*Id.*) Respondent contends that $185,000.00 for past pain and suffering is a more appropriate award. (ECF No. 68, p. 21.) Respondent does not object to the requested amount to reimburse Medicaid. (*Id.* at n. 3.)

Petitioner asserts that there is only one well-reasoned GBS damages decision that represents an apples-to-apples comparison to petitioner's case, namely *Wilson v. Secretary of Health & Human Services,* a GBS case which similarly involved tetraparesis, intubation with mechanical ventilation, and inpatient rehabilitation. (ECF No. 64, pp. 2, 31-32 (citing No. 20-588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021).) The *Wilson* petitioner was awarded $175,000.00; however, petitioner argues his case is more severe for several reasons. (*Id.* at 31-32.) Specifically: Petitioner's intubation was twice as long (16 vs 8 days); his hospitalization was twice as long (34 vs 15 days); and he had a more extended course of IVIG treatment (2 courses of IVIG over 7 days versus 5 days of PLEX therapy). (*Id.* at 32.) Additionally, the *Wilson* petitioner was retired, meaning his work was unaffected and he was able to pursue extended outpatient therapy without impediment. (*Id.* at 31-33.) Petitioner, however, was a 7th grader at the time of his injury and was required to return to school soon after being released from inpatient rehabilitation. (*Id.* at 33.) Overall, petitioner stresses that at his stage of life, he was particularly susceptible to emotional distress from his injury and its sequela.

Respondent agrees that the *Wilson* decision is reasonably comparable, but contends that petitioner has not substantiated the $75,000.00 departure from the award in *Wilson* that petitioner proposes. (ECF No. 68, pp. 17-18.) Respondent notes that the *Wilson* decision itself explains that prior GBS awards over $200,000.00 have included "exceptional circumstances" that are not present here. (*Id.* at 13 (quoting *Wilson*, 2021 WL 5143925, at *4).) Respondent also stresses that the *Wilson* petitioner suffered cardiac arrest during his hospitalization. (*Id.* at 18.) According to respondent, the hospital courses were otherwise comparable. (*Id.*) Additionally, even if petitioner's hospital course was initially more severe, his ultimate return to baseline outpaced the *Wilson* petitioner. (*Id.*) In particular, the *Wilson* petitioner remained in a wheelchair for three months after inpatient rehabilitation and developed shingles and bed sores. (*Id.*) Petitioner, by contrast, had returned to school by three months post-rehab and was able to walk independently and up and down stairs after undergoing half as many therapy sessions. (*Id.* at 19.) Respondent suggests that an additional decision, *Elenteny v. Secretary of Health & Human Services*, is also instructive. (*Id.* at 20 (citing No. 19-1972V, 2023 WL 2447498 (Fed. Cl. Spec. Mstr. Mar. 10, 2023)).) Respondent

suggests this case is similar to *Elenteny* in that the *Elenteny* petitioner had a difficult initial course, but a good recovery within two years. (*Id.*) The *Elenteny* petitioner was awarded $180,000.00. (*Id.*) Respondent stresses that his proposed award of $185,000.00 is above the median award for GBS cases, explaining that prior reasoned GBS decisions have awarded damages ranging from $125,000.00 to $192,500.00. (*Id.* (citing *Schenck v. Sec'y of Health & Human Servs.*, No. 21-1768V, 2023 WL 2534594, at *3 (Fed. Cl. Spec. Mstr. Mar. 16, 2023)).)

In response to respondent's reference to "exceptional circumstances," petitioner cites the decision in *Graves v. Secretary of Health & Human Services*, which rejected the idea of awarding damages in this program based on a continuum. (ECF No. 69, pp. 2-3 (citing 109 F. Cl. 579 (2013)).) Petitioner also stresses that the statutory cap on damages was set over 30 years ago, seeming to suggest that a reasonable award in today's dollars would be far more likely to reach or exceed the cap. (*Id.* at 3-4.) Petitioner disputes that the *Elenteny* petitioner's initial course included debilitation comparable to this case. (*Id.* at 9.) Petitioner asserts that comparing this case to cases involving less severe hospital courses, but more prolonged recoveries, is an error. (*Id.*) "[T]he fact that [p]etitioner may have experienced a significant recovery in no way diminishes the absolute hell that he suffered for months while he experienced and eventually recovered, in significant part, from total body paralysis and ventilator dependence." (*Id.* at 1.)

## V. Analysis

As respondent has observed, there are a number of prior reasoned decisions by special masters awarding damages in GBS cases. Though these decisions are not binding, they are generally persuasive and, as a body, provide context in assessing the damages in this case. Most of these decisions have been issued by the Chief Special Master in the context of the Special Processing Unit ("SPU"). As of March of 2023, the Chief Special Master noted a body of prior reasoned decisions in SPU awarding between $125,000.00 to $192,500.00 for pain and suffering. *See Schenck*, 2023 WL 2534594, at *3 n.7. However, this is not a ceiling. Other special masters have in some circumstances awarded higher amounts. *E.g. Hood v. Sec'y of Health & Human Servs.*, No. 16-1042V, 2021 WL 5755324 (Fed. Cl. Spec. Mstr. Oct. 19, 2021) (Special Master Oler awarding $200,000.00 for past pain and suffering); *Creely v Sec'y of Health & Human Servs.*, No. 18-1434V, 2022 WL 1863921 (Fed. Cl. Spec. Mstr. Apr. 27, 2022) (Special Master Gowen awarding $250,000.00 for past pain and suffering). The Chief Special Master has indicated that the median award among reasoned decisions is $165,000.00. *Schenck*, 2023 WL 2534594, at *3 n.7. By way of comparison, the median proffered award for GBS is a still similar $170,000.00. *Id.*

Given that pain and suffering is inherently subjective and given the number of variables involved in assessing each petitioner's medical history, direct comparison to specific cases can be difficult. Based on my review of the prior reasoned GBS decisions, there is often a significant focus on the duration of pain and suffering. For

11

example, in *McCray v. Secretary of Health & Human Services*, the Chief Special Master addressed a case in which the petitioner's initial hospital course was "not as traumatic" as other GBS cases, such as those involving patients that had to be intubated, but awarded an above-median $180,000.00 for pain and suffering based on the longer-term duration of residual symptoms. No. 19-0277V, 2021 WL 4618549, at *4-5 (Fed. Cl. Spec. Mstr. Aug. 31, 2021). The Chief Special Master also explained that the longer-term consequences of GBS were significant factors in several other similar cases where awards ranged from about $170,000.00 to $180,000.00. *Id*. at 4. Therefore, care must be taken in assessing the details of this case against the broader trend in awards. As petitioner argues, cases that are less severe initially and focus instead on more significant long-term sequela are not easily compared to the present case given that severity of the injury and duration of the suffering are two separate considerations. Thus, I agree that the *Wilson* case discussed by both parties offers the most helpful individual comparison. Accordingly, it is utilized as a key point of reference. However, I do not rely on any one prior decision to determine the amount of petitioner's damages in this case. Instead, I have reviewed previous GBS awards, the arguments presented by the parties, and the totality of the evidentiary record.

The *Wilson* case demonstrates that a case involving a severe initial course of GBS can still warrant an above-median award for actual pain and suffering even when followed by a good recovery. However, petitioner is not persuasive in suggesting that a dramatic upward adjustment from the *Wilson* award is necessary or appropriate in accounting for the specific details of this case. In arriving at the award in *Wilson*, the Chief Special Master stressed the gravity of petitioner's initial condition, noting that petitioner faced a "truly acute" situation and required "invasive treatment." 2021 WL 5143925, at *4. Nonetheless, as respondent notes, the Chief Special Master also indicated that the case lacked any type of "exceptional circumstances" that would warrant an unusually high award such as those over $200,000.00. *Id*. at *4-5. Petitioner argues that the severity of petitioner's initial hospital course constitutes an "exceptional circumstance" in itself; however, this is not persuasive as a response to the rationale of the *Wilson* decision, which contrasts a severe initial course of GBS, similar to this case, against what would be considered further aggravating circumstances.[5] (ECF No. 69, pp. 4-5.) Although there are some differences, petitioner's hospital course

---

[5] To be clear, the Chief Special Master did not specify what was meant by "exceptional circumstances" and did not cite to any particular case having an award of $200,000.00 or greater. However, elsewhere in his analysis he did cite a prior case, *Dillenback v. Secretary of Health & Human Services*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr July 29, 2019), as distinguishable due to that petitioner having suffered a negative impact to her employment in addition to the more direct effects of her injury. In a later case featuring a comparison to *Wilson*, the Chief Special Master noted an absence of "special circumstances" that would increase an award, which he characterized as including "inability to take pain medication, complicated surgeries, or special family circumstances that would compound pain and suffering." *Miles v. Sec'y of Health & Human Servs.*, No. 20-146V, 2023 WL 21155, at *8 (Fed. Cl. Spec. Mstr. Nov. 28, 2022). Importantly, discussion within this decision of "exceptional circumstances" does not suggest the application of any kind of additional test or evidentiary burden. It is simply the language that was employed in the prior case at issue and therefore its discussion is necessary to understand the outcome.

does not distinguish it from *Wilson*. Rather, that is precisely why petitioner first raised it as comparable. As petitioner stressed, both the *Wilson* case and this case involve tetraparesis, intubation with mechanical ventilation, and inpatient rehabilitation. While petitioner's initial disease course was more severe than typical, none of what petitioner experienced was beyond the overall range of expected consequences among GBS patients and he did have a good recovery.

In terms of direct comparison to the *Wilson* case, this petitioner's hospitalization was significantly longer than the *Wilson* petitioner's hospitalization as was the duration of his intubation. However, the *Wilson* petitioner suffered additional serious issues beyond his GBS itself that are not present in this case, including asystolic arrest, shingles, and bed sores. 2021 WL 5143925, at *4. While respondent stresses this petitioner's faster overall recovery, petitioner is also correct in noting that the *Wilson* petitioner's status as a retiree was a factor in arriving at his award given that his recovery and lingering sequela did not conflict with any competing demands. *Id.* at *5. In contrast, this petitioner was in the midst of his primary schooling. Ultimately, both the *Wilson* petitioner and this petitioner had good recoveries. In assessing the *Wilson* petitioner's overall award, the Chief Special Master persuasively explained that "the evidence of some lingering sequelae must also be balanced against the fact that petitioner's recovery in the most important areas of function and mobility has been good." *Id.* On the whole, I am persuaded that this case warrants an award *somewhat* higher than what was awarded in *Wilson*. In that regard, respondent's proposed award of $185,000.00 is $10,000.00 higher than the *Wilson* award.

Petitioner's motion stresses both his own personal fear and the arduousness of his recovery from GBS and I do accept the idea that petitioner's age includes considerations not seen in many of the prior awards. The specific demands of a primary school environment are distinct given that children are intended to progress through their curricula in lockstep. Additionally, an adolescent may be more emotionally vulnerable to hardship or embarrassment, including both the initial fear of the disease, especially given this petitioner's respiratory failure and intubation, as well as the indignities that can accompany recovery. These considerations are well illustrated by petitioner's sworn statement. Accordingly, this is factored into the specific amount of petitioner's award. However, petitioner is not persuasive in suggesting that this necessarily counsels an *outlier* award relative to other GBS cases. The fear and emotional distress GBS engenders has likewise been accounted for in determining prior GBS awards. The Chief Special Master has indicated that these awards must account for the fact that "GBS is a serious injury." *W.B. v. Sec'y of Health & Human Servs.*, No.18-1634V, 2020 WL 5509686, at *5 (Fed. Cl. Spec. Mstr. Aug. 7, 2020). In that regard, the Chief Special Master has repeatedly stressed that "GBS constitutes a particularly alarming kind of vaccine injury – and that as a result, the pain and suffering award allowed should be a bit higher than average to account for the frightening nature of the condition." *Elenteny*, 2023 WL 2447498, at *4; *Clemens v. Sec'y of Health & Human Servs.*, No. 19-1547V, 2022 WL 2288515, at *6 (Fed. Cl. Spec. Mstr. May 17,

2022); *see also Gruba v. Sec'y of Health & Human Servs.*, No. 19-1157V, 2021 WL 1925630, at *4 (Fed. Cl. Spec. Mstr. Apr. 13, 2021) (explaining that, in GBS cases, "[t]he actual pain and suffering component will nonetheless be larger than in many vaccine injury cases, simply for the reason (as I stated at hearing) that the severe and frightening quality of an immune-mediated injury like GBS warrants commensurate damages").

The biggest factual disagreement between the parties involves the value of petitioner's March 14, 2022 physical therapy evaluation by Braden Roberts, DPT, in evidencing the status of his ultimate recovery.  (Ex. 81.)  Prior to March 14, 2022, petitioner had last been evaluated on August 12, 2019.  (Ex. 11, p. 68.)  That August 2019 revaluation was followed by twelve physical therapy sessions ending in October of 2019.  At the time of his discharge from physical therapy, petitioner's primary issues were lower extremity fatigue and poor endurance; however, continued improvement was expected as petitioner was likely still experiencing myelin regeneration.  (*Id.* at 129.)  Thus, respondent stresses that the March 14, 2022 evaluation, which occurred more than two years after petitioner otherwise stopped seeking therapy, was specifically for purposes of litigation.  (ECF No. 68, pp. 16-17.)  In particular, the record states that "Pt's mother states there is a current court case regarding the flu vaccine from 2017 and wants a full body examination for their lawyer."  (Ex. 81, p. 9.)

Respondent raises three specific issues:  (1) the encounter should receive less weight overall because it cannot be assumed to be an unbiased treatment record; (2) to the extent a physical exam was involved, a physical therapist is not qualified to offer an opinion as to the cause of any symptoms as that would be the domain of a neurologist or medical doctor; and (3) the observations on physical examination are not consistent with the prior medical records.  (ECF No. 68, pp. 16-17.)  In response, petitioner stresses that the physical therapist was not a retained expert and this petitioner had no other medical issues that could potentially complicate the assessment of his GBS sequela.  (ECF No. 69, pp. 5-8.)

Evaluation of the March 14, 2022 encounter record requires distinguishing two features of the record – that information which was supplied by petitioner and his mother versus that information that the physical therapist directly observed and his resulting conclusions.  Medical records typically garner evidentiary weight because they involve "information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  However, "for many medical symptoms or events – such as headache and other pain, dizziness, nausea, and vomiting – the patient's or a parent's testimony may be the best, or only, direct evidence of their occurrence.  Medical records related to those symptoms would likely be based on the statements of those who experience them."  *James-Cornelius v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021).

14

Here, the record at issue specifies that the encounter was sought for purposes of litigation and petitioner had otherwise stopped seeking follow up therapy over two years earlier.  Moreover, the record specifies that petitioner wanted an evaluation only and declined the physical therapist's recommendation for further therapy.  (Ex. 81, p. 11.)  Without a bona fide ongoing treatment relationship, the credibility and reliability of the history provided by petitioner and his mother is not enhanced merely because it was recorded by a medical provider.  This does not mean the information should be assumed to be inaccurate; however, it is at best merely unsworn repetition of the testimonial evidence petitioner and his mother have otherwise provided.

The direct observations and impressions of the physical therapist are more valuable.  Although respondent is correct that Mr. Roberts is not a medical doctor, this is not *per se* problematic.  Mr. Roberts was familiar with petitioner's condition because he was involved as petitioner's physical therapist throughout his recovery from GBS and respondent has not substantiated that his attribution of symptoms to petitioner's previously diagnosed GBS moved beyond the appropriate role of a physical therapist.  Physical therapy records are often relied upon in assessing damages.  *See, e.g.*, *Ratzlaff v. Sec'y of Health & Human Servs.*, No.18-1017V, 2023 WL 4072909, at *9 (Fed. Cl. Spec. Mstr. May 24, 2023) (accepting a physical therapist's disability rating and opinion regarding permanence as evidence supporting an award of future pain and suffering).  In the instant case, the physical therapist offered a reasoned opinion that petitioner was continuing to suffer residual effects of his GBS based on the report of symptoms as well as his own evaluation and familiarity with petitioner's past treatment.  In any event, even setting aside the March 14, 2022 record, petitioner's earlier physical therapy records did not suggest that he was entirely asymptomatic.  (Ex. 11, *passim*.)

However, even while maintaining that he continues to experience residual effects, petitioner acknowledges that his recovery was "significant," if not "miraculous."  (ECF No. 69, n. 1.)  He further suggests that "nobody is going to suggest that the results of [p]etitioner's March 14, 2022 physical therapy evaluation are devastating to [r]espondent's case."  (*Id.* at 6.)  In that regard, other records highlighted by both parties show that petitioner had returned to normal physical activities despite lingering sequelae.  (*See* ECF No. 64-1, p. 4 (petitioner quoting Ex. 11, p. 13, which indicates as of February 28, 2018, that petitioner "[i]s doing more in PE and getting more strength and balance.  Doesn't feel like he fatigues quicker or anything."); ECF No. 68, p. 14 (respondent citing Ex. 10, p. 12, which documents on August 8, 2018, that petitioner "played soccer in spring 2018.  He had no exertional difficulties."); ECF No. 64-2, p. 1 (petitioner quoting Ex. 11, p. 64, which documents as of August 8, 2019, that petitioner had been kayaking, albeit with a report of difficulty); ECF No. 64-2, p. 2 (petitioner quoting Ex. 11, pp. 87-88, which documents as of September 5, 2019, that petitioner was able to run a full mile, albeit with subsequent leg soreness).  Additionally, although the March 14, 2022 physical therapy evaluation references "chronic" residua, this cannot be equated with permanence.  (Ex. 81, at 11.)  The physical therapist recorded that petitioner's presentation is "evolving with changing characteristics" and offered no

15

suggestion petitioner had reached maximum medical improvement. (*Id.* at 9.) Rather, additional therapies were recommended, but declined. (*Id.* at 11.) No further detail is offered regarding the expected time course for recovery.

Although petitioner's motion includes a bare assertion that damages for projected pain and suffering are appropriate, he has not articulated the basis for such damages. Rather, petitioner merely asserts that his total damages, inclusive of actual and projected pain and suffering, should reach the statutory cap without delineating any separate assertion of a quantum of damages for projected pain and suffering or any specific argument in support. Petitioner has not provided any significant medical opinion with respect to his expected future course nor pointed to any medical opinion that he argues would otherwise support the conclusion that his injury is permanent. (*See* ECF No. 64, pp. 26-28; *see also* ECF Nos. 64-1, 64-2.) Accordingly, I conclude that petitioner has not met his burden of proof with respect to any separate award for projected pain and suffering. Instead, I conclude that it is appropriate to account for the entirety of petitioner's clinical course, including lingering sequela, in the context of his award of actual pain and suffering.

For example, in the above-cited *Elenteny* decision, the Chief Special Master recently observed that "substantial recovery does not mean that Petitioner has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." 2023 WL 2447498, at *5. However, he found the petitioner's ongoing sequelae were more appropriately addressed by factoring in any future pain and suffering into the "magnitude of the past component." *Id.* at *5-6. The Chief Special Master compared the case against a prior decision in which there was "substantial evidence of the permanent and substantial impact of Mr. Hood's injury on his livelihood, including testimony by two life care planners and a vocational expert." *Id.* (discussing *Hood v. Sec'y of Health & Human Servs.,* No. 16-1042V, 2021 WL 5755324 (Fed. Cl. Spec. Mstr. Oct. 19, 2021)). In contrast, the *Elenteny* petitioner did not provide sufficient evidence to support a separate claim for projected pain and suffering "such as evidence showing a comparable degree of work limitations due to GBS sequelae." *Id.* Other prior cases indicate that an award for projected pain and suffering is more appropriate in cases where there is evidence of significant debilitations. *See, e.g., Hernandez v. Sec'y of Health & Human Servs.*, No. 21-1572V, 2023 WL 3317354, at *5-6 (Fed Cl. Spec. Mstr. May 9, 2023) (finding that ongoing physical therapy alone does not in itself represent grounds for an award of future pain and suffering); *Gruba*, 2021 WL 1925630, at *4-5 (awarding damages for future pain and suffering based on "lingering sequela" coupled with a consequent disruption to employment); *Hinton v. Sec'y of Health & Human Servs.*, No. 16-1140V, 2022 WL 17957317, at *3 (Fed. Cl. Spec. Mstr. Nov. 29, 2022) (awarding $500 per year for future pain and suffering where petitioner was found to suffer permanent lower extremity weakness and gait disorder).

In sum, respondent's proposed award of $185,000.00 is not necessarily unreasonable whereas petitioner has not substantiated his much higher proposed award, which would constitute a fairly dramatic departure from most prior GBS cases. Balancing all of the above, and considering the record as a whole, I find that $195,000.00 is an appropriate award for petitioner's actual pain and suffering and that no separate award for projected pain and suffering is warranted.

## VI.    Conclusion

In light of the above, I award petitioner a total of $195,059.44 as follows:

- **a lump sum payment of $195,000.00, representing compensation for actual pain and suffering, in the form of a check payable to petitioner; and**

- **a lump sum payment of $59.44 in the form of a check payable to petitioner and**

> **Optum**
> **75 Remittance Drive**
> **Suite 6019**
> **Chicago, IL 60675-6019**

**This amount represents reimbursement of a State of Iowa Medicaid lien for services rendered on behalf of petitioner.**

The clerk of the court is directed to enter judgment in accordance with this decision.[6]

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.